# Pittsburgh, Fort Wayne and Chicago Railway Company

## *v.*

## Asbury F. Fawsett *et al.*

1. Payment *to an agent — evidence.* In an action by a shipper of stock upon a railroad, against the company, to recover the amount of certain drawbacks, to which he claimed he was entitled in respect to such shipments, it appeared, the contract on the subject of such drawbacks was made with the shipper by a party who acted as agent for the company, but only for the purpose of procuring cattle shipments over their road, and that the contract was made with knowledge on the part of the shipper that, by the routine of such business as transacted by the company, the money for the drawbacks would come to him through the hands of such agent, and to that routine the shipper gave his assent: *Held,* under such circumstances the agent of the company became the agent of the shipper for the purpose of receiving the money, whether the latter gave him distinct authority so to do or not, and a payment of the money, by the company, to such agent, would exonerate the former from any further liability to the shipper in respect thereto.

2. And certain documentary evidence, tending to prove that the company had paid the money to the agent, consisting of an account concerning the drawbacks, approved by the proper officers of the company, and a check drawn in favor of the agent for the money, and indorsed by him, was held to be admissible in behalf of the company.

3. Settlement of accounts — *inference as to what is embraced therein.* In an action to recover a sum of money alleged to be owing to the plaintiff from the defendant, it appeared the latter had paid the money to a third person, who stood in the relation of agent to the plaintiff in respect thereto, and that such agent and the plaintiff, after the payment to the former, and

33 — 56th Ill.

prior to the bringing of the suit, had a settlement of certain transactions between them, involving an amount much larger than the sum so paid to the agent, but it did not appear what specific matters were embraced in that settlement : *Held,* it was fair and reasonable for the jury to infer that the subject matter of the suit was included in the settlement.

4.  CONTRACT — *whether it relates to past transactions.*  A shipper of cattle made a contract with a railroad company, by which he was to have certain drawbacks upon shipments over their road, it being agreed the shipper should be allowed the same drawbacks which other companies were paying him.  The contract was construed not to relate to shipments made prior to the time it was entered into.

5.  CONSIDERATION.  Moreover, as to such prior shipments there would be no consideration to support a promise to pay drawbacks.

APPEAL from the Superior Court of Chicago ; the Hon. JOSEPH E. GARY, Judge, presiding.

This was an action of assumpsit, brought by Asbury F. Fawsett and Jacob J. Bankard against the Pittsburgh, Ft. Wayne and Chicago Railway Company, to recover certain claims alleged to be owing by the defendants to the plaintiffs. It appears, that during the years 1863, 1864 and 1865 the plaintiffs were extensive shippers of live stock from the city of Chicago to Baltimore, in the State of Maryland, and their stock passed over the defendants' road from Chicago to Pittsburgh, thence, by the way of the Pennsylvania Central and the Northern Central railroads, to the city of Baltimore.

It appears, from the evidence, that the officers of the trunk lines of railroad, from Chicago to the east, at certain intervals, met and fixed a tariff of freight charges from Chicago to certain eastern points, among which was Baltimore.   As the competition for business between the different lines was sometimes very sharp, the custom arose of allowing to very heavy shippers what were called *drawbacks,* that is, a certain rate, per car, or per hundred pounds, to be refunded to them by the railroad company, in consideration of their making all of their shipments over some one of the competing routes.

The proof shows that the Pennsylvania Central and the Northern Central railroads made an agreement to and did pay

to the plaintiffs certain drawbacks upon the shipments over their portions of the through line, from Chicago to Baltimore. The plaintiffs claim that the defendants, through one Joseph McPherson, the stock agent of the company in Chicago, had agreed to give them the same amount of drawbacks as were allowed them by the other companies, and that these drawbacks, for the recovery of which this suit was brought, had never been paid. A trial by jury in the court below resulted in a verdict for the plaintiffs of $28,200, on which judgment was entered. The defendants appeal.

As tending to show that these drawbacks to the amount of $995 on 398 cars of cattle, at $2.50 per car, a portion of the cars for which the plaintiffs sought to recover, had been paid, the defendants offered certain documentary evidence, which was excluded by the court. As to the manner in which claims for drawbacks were paid, and the custom of the company in that regard, *Louis Erickson* testified, that he was McPherson's book-keeper; that in cases of drawback contracts, vouchers would be sent from McPherson's office to Pittsburgh (where was situated the principal office of the defendants, and where all accounts against the company were sent for approval by the general superintendent, before being paid), and there be approved, and then returned to Glover, the cashier, at Chicago. The vouchers would be an order on the railroad company to pay so much money to Glover for drawbacks. On their being returned to Glover, he would give McPherson credit for the amount. These vouchers, showing the amount the party was entitled to, were signed, and sent by McPherson to inform the officers at Pittsburgh, that a certain contract had been made by McPherson with the shipper to allow so much drawback. After the voucher was signed in Pittsburgh and McPherson's contract approved, it would be sent back to Glover or the witness, and witness would get the money on it from Glover and pay it over to the shipper. He did the business as McPherson's book-keeper, and would get the money of the cashier and pay it over to the parties

entitled. He collected, in the usual way, on McPherson's order, on the 6th September, 1865, the $995, for 398 cars at $2.50 per car, but could not tell whether it was paid over to Fawsett or not.

*John Wolwork* testified, that he was in the employ of McPherson as shipping agent at the Fort Wayne stock yards; that whenever McPherson made a drawback contract, the freight would always be billed at the regular rates, and the drawback afterward paid back by the company on McPherson's order. The company would pay the drawbacks through McPherson.

The following is the evidence excluded by the court :

Accounts Payable.

The Pittsburgh, Fort Wayne
     and Chicago
   Railway Company.

To A. F. Fawsett,          Dr.
Address, Baltimore.

State at what station, or in what subdivision, and for what particular purpose the articles were used.

| 1865 Order No..... | Amount of drawbacks on 398 car loads of cattle shipped from Chicago to Baltimore, *via* Pittsburgh, from February 1st to April 30th, 1864. | | |
|---|---|---|---|
| | 398 cars at $2.50........ | $995 | 00 |

The above items have been received at this      day of 186 , inspected and found correct and in good order.

" Authorized, examined and found correct,
           (Signed)        Jno. J. Houston, G. F. A.

"Examined and approved,

Supt.     Division.

Approved  (Signed)

J. N. McCullough, *Gen. Supt.*

"General Purchasing Agent,

Mr. HOUSTON.

"J. McPherson says it was a contract and should be paid."

Following the above, was a statement in detail of stock shipped to Baltimore, by Fawsett, *via* the defendants' road, from February 1st to April 30, 1864, showing he had shipped during that time 6,738 head of cattle in 398 cars.

"ACCOUNTS PAYABLE.

"The Pittsburgh, Fort Wayne & Chicago Railway Company, to A. F. Fawsett, Dr.

Address, Baltimore.

"1865. For amount of drawbacks on 398 car loads of cattle shipped from Chicago to Baltimore, *via* Pittsburgh, from February 7th to April 30th, '64.

398 cars, at $2.50 ......................... $995 00

⎧ U. S. ⎫
⎨ Int. Rev. ⎬
⎩ stamp 2 cents. ⎭

I certify that the above is a true copy of an original account, duly authorized and approved by general superintendent, that the same has been examined by me and found correct; that it has been duly registered and filed in the comptroller's office, and is hereby approved for payment.

"J. P. Farley, *for Comptroller.*"

"Received, October 10th, 1865, of the Pittsburgh, Fort Wayne & Chicago Railway Company, $995, in full for the above account.

"$995.      Sam. J. Glover, *Cash.*"

"Note.— The above receipt must be dated and signed by the party in whose favor this voucher is made, or when signed by another party, the authority for so doing must, in all cases, accompany it."

Attached to the above receipt is the following:

"Pittsburgh, Fort Wayne & Chicago Railway Company will pay S. J. Glover, or bearer, the amount due me for drawbacks on 398 cars cattle, from Chicago to Baltimore, from February 1st to in the month of April 30th, 1864.

"A. F. Fawsett."

Witness, .

"Note.— Orders for different kinds of service, or for different months, should be made on separate blanks."

"Received      186 , of the Pittsburgh, Fort Wayne & Chicago Railway Company, for      the sum of      dollars ($995) in full for the month of      186 , as above specified.

Witness, .

(Check Referred to Above.)

"No. .                              September 8, 1865.

FIRST NATIONAL BANK,

and

DEPOSITORY OF THE UNITED STATES,

Chicago, Illinois.

South-west corner Lake and Clark streets.

"Pay to Jas. McPherson, or order, nine hundred and ninety-five dollars.

$995.

Sam'l Glover,<br>*Cash'r.*"

Indorsed :

J. McPherson,

S. Erickson.

*S. J. Glover* testified: "I am the cashier of defendants at Chicago; vouchers for drawbacks were paid through McPherson, the stock agent. It was customary for me to draw money on orders similar to the one attached to this voucher (meaning

the above order, purporting to have been signed by Fawsett);
that is the kind of order on which drawback contracts were
usually paid.   McPherson would settle with the parties enti-
tled to the drawbacks; the check for $995 was drawn by me,
payable to McPherson, and paid by me on this order in the
usual way of making payments.   I don't recollect who pre-
sented the check, but it is made payable to McPherson; they
were always paid through McPherson's office; that is the usual
form of voucher; they must be approved at Pittsburgh, at the
main office, after which they come to me and I pay them.
We have regular systems for doing this business.   McPherson
was the stock agent at Chicago, and drawback vouchers came
through him; when they came from him I sent a check to him
to be paid over to the parties."

Mr. F. H. Winston and Mr. George C. Campbell, for the
appellants.

Messrs. Walker, Dexter & Smith, for the appellees.

Mr. Justice Breese delivered the opinion of the Court:

The only questions raised on this record important to be
considered are, first, the ruling of the court on the documen-
tary evidence offered by appellants on the trial below; second,
the time at which the contract for drawbacks commenced, as
affecting the amount of the verdict; and last, instruction five
asked by the defendants and refused.

That the documentary evidence offered by appellants, in
regard to drawbacks on three hundred and ninety-eight cars,
saving and excepting the order purporting to have been
indorsed by Fawsett, but not in his handwriting, was proper
to go to the jury, will be apparent from the consideration of
the character of appellees' claim.

It is in proof McPherson was not connected with appellants
in any other capacity than as agent to procure cattle shipments

over appellants' road; that he contracted with Fawsett in June, 1863, that appellants should allow him the same drawback on his shipments of cattle that was allowed him by the Pennsylvania Central and Northern Central, over whose roads the cattle shipped by appellants' road would pass to the Baltimore market.

Fawsett, in his testimony, says, he looked to McPherson to have the papers arranged so that he could get the drawbacks; intended to take the general routine to do the business; repeatedly asked McPherson to get the papers into shape; thinks very likely he knew the general course of business was that the money was paid by the company to McPherson.

This testimony was given when recalled to rebut the testimony of McCullough, given in his deposition. In his first examination in chief, he testified that he never received money from appellants on account of drawbacks; he applied only to McPherson for payment of drawbacks; during the period of his shipments, he never stated the contract to any officer of the road; went often to McPherson in 1863-4-5, demanding his drawbacks, but did not go to the officers of the road; made his contract with McPherson; he promised to pay.

Fawsett distinctly states, the usual routine of doing such business was to be taken. What that routine was is shown by the testimony of Louis Erickson and John Wolwork, employees of McPherson, the first named as book-keeper and the other as shipping agent, and by S. J. Glover, the cashier of appellants. From the testimony of these witnesses, the routine of business in regard to drawbacks is clearly established, and was pursued, as the documentary evidence excluded shows. By pursuing that routine, with which Fawsett had full knowledge, the money for drawbacks would necessarily come into McPherson's hands, and that it did so come on these 398 cars there can not be the least doubt. It is immaterial whether Fawsett gave McPherson distinct authority to receive the money or not; by the routine of the company in such cases it was bound to come to McPherson's hands, and to this Fawsett testifies he sub-

mitted. There can not be the least doubt that the drawback on these cars, amounting to $995, was paid by the company to McPherson, and the evidence excluded should have been admitted as tending to show it at least.

In another aspect of the case this testimony was proper, for it appears in the year following, in 1866, — a few months after the receipt of this money — McPherson brought an action against Fawsett, claiming from him more than $20,000 on a cattle contract. To this action Fawsett pleaded a set-off, and swore to the plea. In answer to the question, " Had you then a set-off against McPherson for the whole amount of his claim," Fawsett answered: " There was something coming to me — money that had been loaned, or got into his hands some way or another; I gave him $21,000 or $22,000, and whatever was coming to me at that time; I think it was $4,000 or $5,000 McPherson owed me, which he allowed in this settlement."

Now, as no figures, vouchers or other papers were produced by Fawsett, showing the basis on which this settlement was made, was it not a proper question for the jury, did not these $995, which the documentary evidence excluded tended to show McPherson received as drawbacks on these cars, form a part of the $4,000 or $5,000 McPherson allowed Fawsett on the settlement made in 1866? It would be fair and reasonable so to argue before the jury, as, in a settlement of a claim so large as the one in suit, it is highly improbable Fawsett, in defending against it, would have omitted so large an item as $995. McPherson's lips are sealed in death; probabilities must plead in his favor. While Fawsett says he is positive, in his settlement with McPherson, he did not set off his claim for drawbacks, he must be understood to mean, not this particular item of money collected for drawbacks by McPherson, but the claim out of which this suit arises; for Fawsett always knew, so we infer from the testimony, that the company had not paid all the drawbacks claimed.

In this connection the third question may properly be dis-

posed of, and that is, the refusal of the court to give this instruction :

"V. If the jury believe, from the evidence, that Fawsett authorized and directed McPherson to collect his drawbacks for him, then any payment made by the defendants to McPherson, on account of such drawbacks, was a payment to the plaintiffs, and they can not recover payment for such drawbacks a second time.

"And if the jury believe, from the evidence, that McPherson, as agent for Fawsett and Bankard, did collect the drawbacks for them upon three hundred and ninety-eight cars of cattle, then no further drawbacks can be collected from defendants upon the three hundred and ninety-eight cars."

From what we have already said, this instruction was proper, because the evidence is incontestible, that the drawbacks were to be paid to McPherson; that they were to come through his hands. He was the agent of Fawsett to receive the drawbacks, as appears from Fawsett's testimony. He never applied to the company for the drawbacks, always expected to get them through McPherson, and if McPherson received this particular drawback, the company should not be obliged to pay it a second time, the more especially when it is seen that these parties, Fawsett and McPherson, shortly after the receipt of the money by McPherson, had a full settlement of heavy claims, in which, it is extremely probable, this sum of $995 was fully accounted for by McPherson.

The remaining point is, at what time did this contract to pay drawbacks commence?

It appears Fawsett had been shipping cattle on this road from April, 1863, to May 2, 1865, but no contract was made in relation to drawbacks until the summer of 1863, as appears by Fawsett's testimony, and that of Charles Karn. Karn says, the contract he was called to witness was in the summer of 1863, and Fawsett says, that is the contract alluded to in his testimony. That contract was, that Fawsett was to receive the same percentage that he got on the other roads he shipped over. McPherson agreed to see that he should have it.

"That was the exact understanding." The shipments, prior to this time, had been paid for, and no drawbacks claimed or allowed until June, 1863. Fawsett says: "I talked to McPherson about it at different times, but we did not agree on a rate until June, 1863. I told him I was getting a rate from the Pennsylvania road and what it was, and he said he would give me the same."

That this related to future shipments there can be no doubt. Fawsett told McPherson what the Pennsylvania road was then paying, and he agreed to allow the same. Such language would not be used in regard to a past transaction, and if it is sought to apply it to such a transaction, then there was no consideration for the promise.

The contract should take effect from June, 1863. All allowances of drawbacks prior to that time, by the jury, were unauthorized, and to that extent the plaintiffs recovered more than they were entitled to recover.

For the reasons given the judgment is reversed and the cause remanded.

*Judgment reversed.*